51 N.J. Super. 507 (1958)
144 A.2d 12
RUTH LUTTENBERGER, ET AL., PLAINTIFFS,
v.
RESTLAND MEMORIAL PARK ASSOCIATION, ETC., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided July 23, 1958.
*508 Messrs. Berry, Whitson & Berry (Mr. Henry H. Wiley and Mr. Franklin H. Berry, appearing), attorneys for plaintiffs.
Messrs. Milton M. & Adrian M. Unger (Mr. Sam Denstman and Mr. Milton M. Unger, appearing), attorneys for defendant.
SCHERER, J.S.C.
This suit is brought by two individuals who own either outright or beneficially lots in Restland Memorial Park (hereinafter called Restland), a cemetery *509 located in the Township of Hanover, Morris County, New Jersey. This cemetery is operated by the Restland Memorial Park Association, a cemetery association duly authorized and operating pursuant to R.S. 8:1-1 et seq.
The suit is brought to set aside a resolution adopted by the trustees of Restland on October 10, 1956, which provides that effective November 1, 1956 all burial vaults installed in the cemetery must be installed and sealed by cemetery employees and that for the service so rendered a charge of $15 will be made to the vault supplier, the charge to be payable when the vault is delivered. The plaintiff, Ruth Luttenberger (now Ruth Borders), is the owner of one lot which she acquired by a deed dated October 29, 1956. The plaintiff, Wesley Hopping, is a funeral director, whose place of business is in Livingston, New Jersey. He claims beneficial ownership of a number of graves although the deeds for them are not registered in his name. Both plaintiffs in depositions admitted that they purchased the graves primarily for investment purposes and resale at a profit. Mrs. Luttenberger bought her lot from Mr. Hopping for the sum of $100. He admits that he made a slight profit on this sale.
The evidence shows that Mrs. Borders is the daughter of one of the owners of the Philip Creter Burial Vault Company, a manufacturer of burial vaults. Mr. Hopping secures most of his vaults from that company. Prior to the adoption of the resolution in question it was the custom of manufacturers of concrete burial vaults to install them in the cemetery and, after the interment, to seal the vaults. The digging of the grave is done by the cemetery employees, as is the filling in of the graves after the vault is sealed.
Mrs. Luttenberger's objection to the resolution, set forth in the first count of the complaint, is that the resolution was adopted without justification, for the purpose of increasing the revenues of the association, and as a result of this arbitrary and unreasonable regulation she will not be able to obtain the customary guarantees given by the vault manufacturers when they set, seal and service the vaults. It is further alleged that she has been denied the right to *510 rely on the training and experience of the employees of the vault manufacturers, thus depriving her of unrestricted rights of sepulture to which she was entitled under her deed. In addition, she charges that the cemetery association by installing the vaults will be engaged in an activity which is ultra vires. She therefore seeks judgment enjoining the enforcement of the resolution as illegal and unreasonable, and a declaration that it is void and in violation of R.S. 8:2-10.
In the second count of the complaint plaintiff Hopping as a funeral director alleges that it is his duty under the statute N.J.S.A. 45:7-34 properly to inter dead bodies, in the course of which he arranges for the securing of an appropriate burial vault, and that he "has found it most expedient and satisfactory for all parties concerned" to have the vault installed, serviced and sealed by the vault manufacturers' employees who have been expressly trained in this work. He further alleges that these companies guarantee their installations, but that since November 1, 1956, when Restland employees began to install and seal these vaults, the vault manufacturers have refused to issue guarantees and that he has been forced to relinquish proper control over the interment of bodies, the sealing and servicing of vaults, all of which amounts to a gross and unjust interference with his business and with the duties vested in him by N.J.S.A. 45:7-1 et seq. He, too, alleges that the regulation is ultra vires and seeks to have Restland enjoined from interfering with his duties as a funeral director and for a declaration that the resolution is void.
The plaintiff Luttenberger did not testify. The plaintiffs' other witnesses were funeral directors and representatives of vault manufacturers. Apparently, the funeral directors were inspired to take action by the vault manufacturers. The latter, after receiving notice on or about October 11, 1956 from Restland that it was going to put this regulation into effect, sent a printed letter dated October 25, 1956 to "New Jersey Funeral Directors" advising them of this fact, stating that thereafter they would not furnish any guarantees of *511 their vaults because the sealing and servicing was not being done by "our trained and experienced employees." They also called attention to the $15 installation charge. Following this, the Funeral Directors' Association of Essex and Union Counties, of which plaintiff Hopping was at that time a trustee, wrote a letter dated November 3, 1956 to Restland stating that the members of the association unanimously opposed the "ruling" for the reasons, among others, that they had for many years received service from the vault manufacturers "who are experts in the delivery, installing, and sealing of these vaults." In that letter they posed the question of who would guarantee the vault, its installation and construction.
The testimony reveals that the installation and sealing of a concrete burial vault does not require any expert training of the persons who do it. The process consists in lowering the concrete vault, weighing approximately 1,200 pounds, into the grave and setting the lid, which weighs about 700 pounds, upright on the vault. The installation is then covered with artificial grass, flowers, or other screening devices so that it is not visible to the persons attending the interment. After the casket is lowered into the vault, the lid is let down either by straps or ropes attached to the lid. If any dirt or foreign substance has fallen upon the edges of the vaults, it is wiped off before the lid is put into place. Some vaults have "shedding" edges which shed such dirt. Most vaults are self-sealing. The sealing compound material used for the seal is already in the lid, so that no further acts are required after the lid is lowered into place. On some types of vaults there are other sealing devices required, but the ones in question here apparently are all self-sealing. The testimony of the vault manufacturers demonstrates quite clearly that their men learn the installation and sealing of the vaults by growing up in the business and doing it. They do not get any special training courses nor apparently are any needed since the operation is a very simple one. Significantly on the question of training, Hopping testified concerning the experience of vault company employees "what *512 the experience is of their men that work for them, I don't know anything about it." And again, "I do not know what their training is." So the claim that the plaintiffs were deprived of the right to rely upon the training of these employees lacks basis in fact.
The resolution in question does not preclude any vault manufacturer from selling his vault to an undertaker or lot owner for installation in the cemetery. The vault manufacturers still have complete freedom of action in selling their vaults to the undertakers who order them for their clients.
The only complaint of the undertakers is that they no longer receive guarantees from the vault companies. Restland has offered to give guarantees, but the funeral directors have not availed themselves of this offer. Hopping testified that he did not accept the guarantee, although he knew it was available, because he thought it would not mean anything. Another undertaker testified also that he did not think the guarantee of Restland was as good as the guarantee of the vault manufacturer.
The evidence leads to the conclusion that the real parties in interest in this case are the vault manufacturers and funeral directors. The former, because they have been absorbing the $15 charges and fear that in the future these may increase, although admittedly, as stated hereafter, they regain part of this charge by the fact that their employees now spend no time at the cemetery except to leave the vault. The funeral directors are interested in setting aside the resolution because they believe that the charge may be passed on to them and because they have been accustomed to using the vault manufacturers' employees to assist them, without cost, in the funeral arrangements at the cemetery. Aside from Mrs. Luttenberger and Mr. Hopping, whose respective interests clearly are not as lot owners but as representatives of vault manufacturers and funeral directors, respectively, no lot owner has complained.
It is argued that a lot owner feels that he has a valuable right of which he is being deprived when he is unable to *513 have the vault manufacturer install the vault. This claim lacks validity when it is considered that the vaults are installed without cost to the lot owner by cemetery employees who are fairly familiar with the routine. The superintendent of the cemetery, who has been employed there for 26 years and who supervises all of the installations, testified that no particular skill is required to install and seal the vault and that cemetery employees have been doing this for many years for out-of-state funeral directors, who generally request the cemetery to handle the installation and sealing of the vaults used by them. In addition to that, cemetery employees have over the years assisted the vault manufacturers in installing and sealing vaults at periods when the latter, because of pressure of business, did not have sufficient men available. The superintendent stated that in approximately 2,500 installations of vaults over a period of five years prior to November 1, 1956, 20 to 25% of the vaults were installed with cemetery help, and that the vault manufacturers themselves asked for this assistance. Since the effective date of the resolution, about seven or eight hundred vaults have been installed by cemetery personnel without any complaints. The undertaker usually purchases the vault for the interment and the persons involved probably do not know whose vault is installed until they receive the written guarantee some time after the interment, and except for wishing to have a satisfactory installation, are not concerned with the identity of the persons installing the vault.
The burden of proof lies with the plaintiff to establish that the regulation in question is an unreasonable one insofar as it affects the persons owning lots in the cemetery. Restland advances several reasons why it passed the resolution. It says, among other things, that over the years it has been dissatisfied with the conduct of vault manufacturers' employees in that they have at various times scuffed or torn up the lawns in carrying vaults from the roadside to the grave; have dug up and marked the turf in installing the vaults in graves; in transporting vaults to grave-sites by rolling them on planks set on wooden rollers which leave *514 marks on the turf; have on occasion been under the influence of liquor; on occasions have left their trucks in plain view of mourners attending funerals; have played ball on the cemetery grounds, eaten their lunch there, fallen asleep there, and even hit golf balls while they are waiting for a funeral cortege to arrive. The principal reason for the resolution, however, appears to be that Restland needs additional revenue to provide hospitalization and other salary benefits for their employees. Testimony shows that after the resolution became effective and the additional revenue was received, some of benefits desired by cemetery employees were put into effect.
The plaintiff asserts that the resolution or regulation is ultra vires as not being authorized by the charter of the cemetery association or by the statute under which it was created. It is stated in National Trust Company, etc. v. Miller, 33 N.J. Eq. 155 (Ch. 1880), that it is a cardinal rule of law that a corporation created by statute can exercise no powers and have no rights except such as are expressly given or necessarily implied. But a corporation has the implied right to exercise such powers as are necessary to carry out the express powers given by its charter or by statute. Camden & Atlantic R.R. Co. v. Mays Landing, etc., R.R. Co., 48 N.J.L. 530 (E. & A. 1886); McCarter, Attorney General v. Firemen's Insurance Co., 74 N.J. Eq. 372 (E. & A. 1909).
Plaintiffs do not show in what respect the challenged action of the defendant is illegal, unauthorized, or contrary to the power granted to it by law. They argue that no specific authority is to be found in R.S. 8:1-1 et seq. While it is true that the Cemetery Act above cited does not specifically sanction this type of activity, this cannot be said to be an act so disassociated with ordinary cemetery activities as to be ultra vires. The erection of a mortuary by a cemetery association was upheld in Moore v. Fairview Mausoleum Co., 39 N.J. Super. 309 (App. Div. 1956). In Ewing Cemetery Association, Inc. v. Ewing Township, 126 N.J.L. 610 (Sup. Ct. 1941), it was held that a crematory was not an improper *515 cemetery function. The installation and sealing of these concrete funeral vaults is an entirely proper cemetery function, and if not a power expressly given by its charter and by statute, it is so much a part of modern cemetery practice as to warrant its being considered as an implied power.
For the argument that the regulation is invalid the plaintiffs rely heavily on People ex rel. Paxton v. Bloomington Cemetery Ass'n, 353 Ill. 534, 187 N.E. 455 (Sup. Ct. 1933), and Scott v. Lakewood Cemetery Association, 167 Minn. 223, 208 N.W. 811, 47 A.L.R. 64 (Minn. Sup. Ct. 1926). Neither of these cases sustain the plaintiffs' position. In People, etc. v. Bloomington, etc., the regulation was held invalid because the cemetery required that all burial vaults be purchased from it and refused to permit lot owners to make interments unless the vaults were so purchased. Such is not the effect of the resolution here. The plaintiffs, or any other lot owners, are able to purchase their vaults from whichever vault manufacturer they choose. The only requirement is that the vault be installed by the cemetery.
In Scott v. Lakewood, supra, the court, in setting aside a regulation which provided that all beautification work on graves was required to be done by cemetery employees, held that while the cemetery could impose rules regulating the type of beautification and requiring that the same be carried out under its supervision, it could not prohibit the lot owner from doing his own work or having it done by his agent. The court in coming to its conclusion relied upon Chariton Cemetery Company v. Chariton Granite Works, 197 Iowa 403, 197 N.W. 457, 32 A.L.R. 1402 (Iowa Sup. Ct. 1924), where that court said that to deprive the living of the highly cherished privilege of personally performing or contracting for the adorning of the spot selected as a last resting place of the dead would be abhorrent to the finer instincts of mankind. The difference between the situation in the cited cases and present one is evident.
A case similar in many respects to the present one was before the court in Orlowski v. St. Stanislaus Roman Catholic Church Society, 161 Misc. 480, 292 N.Y.S. 333 (Sup. Ct. *516 1936). There the defendant cemetery adopted a regulation providing that only it could furnish grass, matting and tents for the decoration of graves at funerals and it would furnish these items for a specified price. Formerly, these items had been furnished by local undertakers or persons engaged by them. There were three groups of plaintiffs: undertakers, persons who supplied the facilities to undertakers, and persons who had burial rights in the cemetery. All claimed that the regulations were unreasonable and an encroachment on the property rights of those persons owning graves. The court in overruling these contentions and sustaining the regulation said that the evidence presented by the cemetery  which was similar in many respects to the evidence presented in this case, viz., that damage had been caused to cemetery property and adjoining lots by the placing of equipment; that there was trespassing committed on the graves of other persons; and that the cemetery had to repair at its own expense the damage done; as well as pacify persons who complained of the trespassing  indicated a need for the regulation. It found that the cemetery had the right and duty to protect its own property and prevent one lot owner from trespassing upon the lot of another and that it had a right to adopt reasonable rules and regulations for the conduct of the cemetery. It found as a fact that the regulation in question was reasonable, and that charges for the service were also reasonable, in that they were similar to the charges which the undertakers had been making and in accord with charges being made by other cemeteries in the vicinity.
In "Rules and Regulations of Cemeteries," 63 N.J.L.J. 305 (Sept. 5, 1940), it is said that the fundamental principles deducible from the authorities are that the rights of the grantee of cemetery property are subject to rules and regulations "now or hereafter existing," and that the cemetery may adopt such rules and regulations as to it seem reasonable in the furtherance of its operations. It is further stated, "we must, of course, start out with the proposition that the people to decide this matter in the first instance are the trustees of the cemetery and they are responsible for keeping the cemetery in proper condition and the exercise *517 of these responsibilities must not be too minutely scrutinized." Dries v. Charles Evans Cemetery Company, 109 Pa. Super. 498, 167 A. 237 (Super. Ct. 1933).
The representatives of the cemetery testified that the regulation in this case was in their opinion necessary, not only from the standpoint of raising additional revenue to meet demands by their employees for increased benefits, but also to assist in the orderly running of the cemetery and in particular to facilitate the conduct of funerals. The regulation in this case passes the tests of clarity, uniformity, and equal applicability to all lot owners, 63 N.J.L.J. 306. The deed issued by the cemetery to Mrs. Luttenberger contains the provision that the conveyance is made subject to any and all rules of the cemetery "now in force or which may be adopted hereafter." A similar provision is contained in the deeds of the plaintiff, Hopping. The resolution adopted October 10, 1956 was in effect and presumably known to Mrs. Luttenberger before she acquired her deed. It is interesting to note that although the resolution became effective November 1, 1956, the present suit was not instituted until August 28, 1957. While the right of the plaintiffs to maintain the suit may be questionable, I prefer to decide the case on its merits.
There is no proof whatever that the charge of $15 is an unreasonable one. None of the vault manufacturers who were witnesses stated that it was. On the other hand, at least, one of them admitted that his company saved money because his men now merely deliver a vault at the cemetery and do not, as was their former practice prior to November 1, 1956, wait around until after the funeral service has been held. Thus a considerable saving of time and wages of employees is secured by the vault manufacturer. There is also evidence that $12 is being charged for the same service in the Philadelphia area where cemetery wage rates are somewhat less, and $15 in Washington, D.C., where wages are comparable. There was also evidence that a cemetery in Montclair, N.J., which in 1955 and 1956 installed its own vaults in the same manner as Restland is now doing, found a charge of $8 to be insufficient. While Restland apparently *518 made no cost survey to arrive at the $15 charge, it did have before it and considered the above cited facts plus the fact that it customarily received $15 for what is called a sectional installation. The time consumed for such an installation is substantially equivalent to the time consumed in installing the vaults. Under the proofs it cannot be said that the charge is an unreasonable one.
In DiCristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244 (App. Div. 1957), the court dealt with a situation comparable in many respects to the present one and said that the reasonableness of cemetery regulations as such was a matter ordinarily between the lot owners and the organization. Judge Conford in his opinion stated, with respect to the power being exercised by defendant cemetery, that the power was not expressed in the statute and if the cemetery had such power it was by implication and existed only to the extent necessary that it was reasonably incidental to the general statutory objective of procuring and holding lots to be used exclusively for a cemetery or place of burial of the dead as required by R.S. 8:1-1.
The installation and sealing of a burial vault by Restland is a power reasonably incidental to the burial of the dead. We do not have here a situation, also discussed in the DiCristofaro case, where the lot owners are obliged to deal solely with the cemetery association. There is contrariety of opinion as to whether such a regulation can reasonably be imposed. See cases listed in DiCristofaro v. Laurel Grove Memorial Park, supra. The only requirement in New Jersey is that the rules of the cemetery as to such matters must be reasonable, Donahue v. Fitzsimmons, 95 N.J. Eq. 125 (Ch. 1923).
It is difficult to see how the regulation in question adversely affects lot owners and aside from the plaintiffs, no lot owner has registered any protest. The lot owner has complete freedom to order any vault he chooses or if, as is usually done, this task is left to the funeral director, he may purchase whatever make of vault he chooses. This vault is installed by Restland. The $15 charge is absorbed by the vault manufacturer. The lot owner does not pay it nor does *519 the funeral director. A guarantee of the installation will be given by Restland in the same manner as the guarantee was formerly given by the vault manufacturer. It is not difficult to guess why the funeral directors, pending the decision in this case, have not availed themselves, on behalf of their clients, of the guarantee offered by Restland. The guarantee has more psychological than legal importance. Only in the case of the disinterment of a body would any one know whether the vault had proven sound. The superintendent at Restland testified that since November 1, 1956 there have been but three such disinterments. He said that such occurrences are infrequent.
There is no evidence to refute the claim of Restland that it needs the additional revenue to provide salary benefits to its employees. No proof was produced showing that, contrary to law, the cemetery by making this charge will make a profit. Some attempt was made to show that the management organization, which operates the cemetery for the trustees, would benefit by the additional income, but this attempt was completely unsuccessful as the proof disclosed that the organization did not receive any fee from the cemetery for its services but secured its revenue from the sale of memorial markers. If at any future date the charge for the installation of the vaults is excessively increased to the detriment of the lot owners, they will have the right to apply to this court for relief.
It has been held that the cemetery has the right to impose reasonable regulations and that if the issue involved is one purely of business and economic problems, these are to be determined by the management of the cemetery and not by the court, Frank v. Clover Leaf Cemetery Association, 48 N.J. Super. 337 (Ch. Div. 1957).
From all of the evidence, it cannot be said that the regulation here imposed is an unreasonable one or that the charge for the service rendered is excessive. The plaintiffs have not sustained the burden cast upon them of showing the resolution to be ultra vires. There will therefore be a judgment entered for the defendant dismissing the complaint with costs.